# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

|  |  |  |
|---|---|---|
| WEST VIRGINIA HOSPITALITY AND TRAVEL ASSOCIATION, INC., a West Virginia Not-for-Profit Corporation, on behalf of All of Its Adversely Affected Members, and as Assignee of Certain of Its Adversely Affected Members | ) ) ) ) ) ) ) |  |
| Plaintiff, | ) ) | Case No. 2:16-cv-00184 |
| v. | ) ) |  |
| AMERICAN WATER WORKS COMPANY, INC., a Delaware Corporation; AMERICAN WATER WORKS SERVICE COMPANY, INC., a New Jersey Corporation; WEST VIRGINIA-AMERICAN WATER COMPANY, a West Virginia Corporation; EASTMAN CHEMICAL COMPANY, a Delaware Corporation; GARY SOUTHERN, an individual; and DENNIS P. FARRELL, an individual, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Defendants | ) |  |

## COMPLAINT FOR RECOVERY OF RESPONSE COSTS, JUDICIAL ABATEMENT OF A PUBLIC NUISANCE, RELIEF FROM PRIVATE NUISANCE, NEGLIGENCE, NEGLIGENCE *PER SE*, GROSS NEGLIGENCE, BREACH OF CONTRACT, AND BREACH OF WARRANTY

Plaintiff herein, the West Virginia Hospitality and Travel Association, Inc. ("WVHTA"), both as an association seeking to vindicate and protect the rights and interests of all of its adversely affected members, and as assignee of the claims identified herein on behalf of certain of its adversely affected members, by and through its undersigned counsel, make the following allegations upon knowledge as to itself and upon information and belief as to all other matters:

### *Nature of this Case*

1.      Plaintiff WVHTA brings this action as a not-for-profit association organized and controlled entirely by its members appropriate equitable relief to abate and address a serious public nuisance condition on behalf of its numerous adversely affected member entities, and as an assignee of the claims of certain adversely affected members to: **(a)** recover response costs under Section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") of 1980, as amended, 42 U.S.C. § 9607(a); and **(b)** to recover money damages and appropriate equitable relief arising from private nuisance, negligence, negligence *per se*, gross negligence, breach of contract, and breach of warranties.  Plaintiff seeks this relief as the consequence of the January 9, 2014, spill and release of a toxic hazardous substance, Crude MCHM, a chemical sometimes used in coal processing, to the environment, which release caused damage to human health and the environment, serious damage to private property, substantial interference with and interruption of private rights of enjoyment, and the closure, by governmental order, of hospitality establishments owned and operated by members and assignees of Plaintiff WVHTA.   Plaintiff as assignee seeks recovery of response costs, which were incurred consistent with the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), 40 C.F.R., Part 300, injunctive relief to address the hazards which still exist to the local water supply and to remediate the damage done to its members, money damages to compensate for the harm to property, the loss of use and enjoyment, and lost profits, and related relief, including the recovery of litigation costs and expenses.

### *Jurisdiction and Venue*

2.     Pursuant to CERCLA § 113(b), 42 U.S.C. § 9613(b), and 28 U.S.C. § 1331, this Court has exclusive, original jurisdiction over the subject matter of the Plaintiff's First Cause of Action. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's remaining causes of action because those claims are so related to the First Cause of Action that they form the same case and controversy under Article III of the United States Constitution.

3.     Pursuant to CERCLA § 113(b), 42 U.S.C. § 9613(b), venue lies in this Judicial District, since the releases referenced in Plaintiff's First Cause of Action occurred in this district. Venue also lies in this Judicial District pursuant to 28 U.S.C. § 1391(b), since a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

### *The Parties*

4.     Plaintiff WVHTA is a West Virginia Not-for-Profit Corporation with its principal place of business in the City of Charleston (Kanawha County), West Virginia. WVHTA's members include the owners and operators of various restaurants, hotels, entertainment establishments, suppliers, service providers and other hospitality establishments, which collectively account for a $3.9 billion dollar annual share of West Virginia's economy. WVHTA exists to promote and advance the tourism and hospitality industries in West Virginia and to protect the common interests of its members, as tourism and hospitality establishments, through advertising and promotional initiatives and by serving as those members' advocate on legislative issues, regulatory matters, and through appropriate legal initiatives.

5.     Plaintiff WVHTA is the assignee of the claims of certain of its adversely affected members.

6.      Defendant American Water Works Company, Inc. ("AmWater Works") is a Delaware Corporation having its principal place of business in Voorhees, New Jersey. Defendant AmWater Works bears legal responsibility for the harms described herein as a consequence of its failure to require, capitalize, and fund the development of an alternate water supply and to properly oversee and manage its wholly owned and controlled subsidiaries, West Virginia-American Water Company, Inc. ("WV AmWater") and American Water Works Service Company, Inc. ("AmWater Service"). Defendant AmWater Works exercises full dominion and control over its subsidiaries Defendants AmWater Service and WV AmWater. Defendant AmWater Works is jointly and severally liable to the Plaintiffs for all damages and other relief sought in this action.

7.      Defendant American Water Works Service Company, Inc. ("AmWater Service"), is a New Jersey corporation and wholly-owned subsidiary of Defendant AmWater Works, having its principal place of business in Vorhees, New Jersey. Defendant AmWater Service negligently performed management, engineering, and water quality services on behalf of AmWater Works for WV AmWater and consequently bears legal responsibility for the harms stemming from the distribution of Crude MCHM into the public water supply. As the service arm which actually performed all of the work required by its sister company, Defendant AmWater Service is liable for the failure to properly warn the members and assignees of WVHTA of the nature of the contaminated water that was distributed to them. Its acts and omissions include failure to properly assess, plan for, and respond to an obvious environmental risk about which it knew or should have known. Defendant AmWater Service is jointly and severally liable to Plaintiff for all damages and other relief sought in this action.

8. Defendant West Virginia-American Water Company, Inc. ("WV AmWater"), is a West Virginia Corporation with its principal place of business in Charleston, West Virginia. Defendant WV AmWater bears legal responsibility for the damages stemming from the distribution of Crude MCHM into public water supply. Its acts and omissions include its failure to properly assess, plan for and respond to an obvious environmental risk about which it knew or should have known and its failure to maintain its facilities in sound, workable condition so to avoid releasing the hazardous chemicals it stored and distributed. Further, Defendant WV AmWater is liable for damages stemming from its failure adequately to warn its customers. Defendant WV AmWater is jointly and severally liable to the Plaintiffs for all damages and other relief sought in this action.

9. Defendant Eastman Chemical Company ("Eastman") is a Delaware Corporation with its principal place of business in Kingsport, Tennessee. As the manufacturer and distributor of Crude MCHM, Defendant Eastman had a duty to protect the public from and give adequate warning of the dangers stemming from the release of Crude MCHM in the Elk River. Through its acts and omission Eastman failed properly and competently to assess, and negligently characterized the risk of Crude MCHM, failed to properly warn of its potential environmental and health hazards.

10. Defendant Gary Southern is a Marco Island, Florida resident above the age of majority. He bears responsibility because of his personal role in directing the day-to-day operations at the facility of Freedom Industries for the two years prior to the spill of Crude MCHM into the Elk River and because he profited from the sale of his interest in a closely-held company as part of the set of mergers and acquisitions which resulted in the Freedom Industries corporate, ownership and management structure prior to the leak of Crude MCHM on January 9,

2014. Defendant Southern is jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action.

11.     Defendant Dennis P. Farrell is a Kanawha County, West Virginia resident above the age of majority. He bears responsibility because of his personal role in directing operations at the facility of Freedom Industries and because he profited from his ownership interest in the facility which he ultimately sold. Defendant Farrell is jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action.

### *Facts Common to All Counts*

12.     On or about January 9, 2014, a large quantity of toxic chemicals publicly estimated to be in the range of ten thousand (10,000) gallons was spilled from an aboveground storage tank located on property ("the Freedom Property") owned and/or operated by Freedom Industries, Inc., in Charleston, Kanawha County, West Virginia, immediately adjacent to and bordered by the Elk River.  The aboveground storage tank contained, and the spilled material consisted of:  **(a)** a commercial chemical product manufactured by Eastman Chemical Company and known by the trade name "Crude MCHM;" **(b)** a second commercial chemical product, manufactured by Dow Chemical Company, and known as propylene glycol phenyl ether or "PPH;" and **(c)** a third commercial chemical product, known as dipropylene glycol phenyl ether or "DiPPH."

13.     The tank storing the Crude MCHM on the premises of Freedom Industries was built using rivet construction in the 1930's.

14.     Defendant Eastman sold Crude MCHM when it knew or should have known that its Material Safety Data Sheets ("hereinafter: "MSDS") and other disclosures and warnings accompanying its sale of the product were insufficient under the circumstances.  That MSDS did,

however, reveal that Crude MCHM is not a chemical compound some or all of the constituents of which have entered into a chemical reaction with each other, but rather is a chemical mixture the constituents of which have not entered into any chemical reaction with each other and that contain the pure commercial chemical product "methanol" (assigned number 67-56-1 by the Chemical Abstracts Service division of the American Chemical Society).

15.    Pursuant to final regulations promulgated by the U.S. Environmental Protection Agency, methanol, when discarded (specifically including spilled or leaked) or intended to be discarded, is listed as a "hazardous waste listed and identified by the Administrator" under subtitle C of RCRA, 42 U.S.C. 6921-6992k (*see* 40 C.F.R. § 261.33).

16.    Pursuant to final regulations promulgated by the U.S. Environmental Protection Agency, "methanol" is also listed as a "hazardous substance" pursuant to CERCLA Section 102(a), 42 U.S.C. § 9602(a) (*see* 40 C.F.R. § 302.4).  In interpreting the provisions of CERCLA § 102(a) and 40 C.F.R. § 302.4, Federal courts have consistently held that where a waste material contains a designated hazardous substance, like methanol, then the entirety of that waste material is itself a hazardous substance for the purposes of CERCLA.  *See, e.g., State of Arizona and the City of Phoenix* v. *Motorola, Inc.,* 774 F. Supp. 566 (D. AZ, 1991) *United States* v. *Carolawn,* 21 Env't Rep. Cases 2124, 2126 (D.S.C. 1984).  Accordingly, the Crude MCHM released from the Freedom Industries, Inc. Charleston, WV, site—a substance which contains a CERCLA hazardous substance—is undeniably a "Hazardous Substance" within the meaning of CERCLA § 101(14), 42 U.S.C. § 9601(14).

17.    On or about January 9, 2014, government officials discovered a licorice smell originating from the facilities of Freedom Industries. The licorice smell is associated with Crude MCHM at concentrations exceeding the chemical's odor threshold, although the MSDS sheet

issued by Defendant Eastman for Crude MCHM lists the odor associated with the chemical as that of alcohol rather than licorice.

18.    Airborne release of Crude MCHM from the Freedom Industries facility caused chemical air pollution resulting in ambient concentrations well above the odor threshold for the chemical over an area of several square miles and over a time period of several days after the January 9, 2014, release.

19.    For several days before the January 9, 2014 release, citizens in the Charleston area detected the licorice smell, which had been noted and reported to Defendant WV AmWater and government authorities in the past by residents.

20.    Defendant WV AmWater initially reported that only two thousand (2,000) to five thousand (5,000) gallons of Crude MCHM leaked into the Elk River.  More recent estimates of the volume of the release are above ten thousand (10,000) gallons.

21.    The spilled toxic mixture quickly reached the Elk River, which runs northwest of and immediately adjacent to the Freedom Industries, Inc. Charleston, WV, Property.  Crude MCHM migrated from the facility of Freedom Industries into the Elk River and thence downstream into the public water intake of Defendant WV AmWater.

22.    A sheen could be still be seen emanating from the facility of Freedom Industries on the afternoon of January 10, 2014, and tests show that the concentration of Crude MCHM in the Elk River at the water intake point was in excess of 500 parts per billion (500 ppb) approximately thirty-six hours after the spill was first discovered.

23.    The temporal and geographic extent of the contamination, the reports of earlier detection of Crude MCHM above the odor threshold, and the age of the Crude MCHM tanks

indicate that Crude MCHM had in all likelihood been leaking from the storage tank for a period of time pre-dating January 9, 2014.

*Notwithstanding Their Knowledge of a Substantial Risk to Human Health and the Environment, Defendants Ferrell and Southern Failed to Take Action to Prevent or to Mitigate the Spill*

24.    At all times relative hereto, Defendant Dennis Ferrell was an owner and an executive with full day-to-day operating authority at Freedom Industries, Inc.   From at least October 2001 through at least December 6, 2013, Farrell served as the president of Freedom and as a member of Freedom's board of directors.   After December 6, 2013, he continued to work at Freedom and described himself occasionally as Freedom's president.   Consequently, Defendant Ferrell knew or should have known about conditions at the facility, including the age and condition of the storage tanks, the associated piping and conveyances, and the secondary containment dikes, and the identity of the materials being stored in those tanks.   Mr. Ferrell had both the knowledge of the risks and potential risks to human health and the environment and the power and authority to effectuate necessary repairs to avoid a spill of Crude MCHM into the Elk River.

25.    Defendant Southern was a member of the board of directors of Freedom beginning in March 2010.   From at least that time until and through January 9, 2014, Southern was a responsible corporate officer of Freedom.   Southern became Freedom's president in December 2013, with responsibility over all aspects of its business.

26.    Defendant Gary Southern recently sold his interest in Enviromine, LLC to Chemstream, LLC for several million dollars. By completing the acquisition and agreeing not to compete with Freedom Industries, Mr. Southern made $9 million for his part in acquisitions by Chemstream, LLC that sealed its control of Freedom Industries and its key personnel. Mr. Southern, due to his position of authority and supervision over the operation of the Freedom

Industries facilities, was in a position to know and correct the environmental problems which led to the toxic release complained of herein. He testified during bankruptcy proceedings that he had substantial involvement with the facility for a period of years preceding the spill.

27.     Mr. Southern knew or should have known about the conditions at the facility.  His acts and omissions in ignoring the obvious threats to the environment and failure to take appropriate steps to mitigate them directly contributed to Plaintiffs' damages.

28.     Despite the smell of Crude MCHM emanating from the facility in the days prior to the spill, no emergency action was taken by Defendant Southern to remedy the situation or begin emergency repairs or to remove the chemicals from the facility.

29.     On or about January 17, 2013, Freedom Industries declared bankruptcy.

30.     During a bankruptcy hearing on January 20, 2014, Defendant Gary Southern, former president of Freedom Industries, gave varying accounts of his relationship with investor J. Clifford Forrest, at one point denying knowing him and later admitting that he had a conversation with him the day before the hearing.

31.     Defendant Gary Southern, former president of Freedom Industries, claimed to have no knowledge as to the location of a one million dollar ($1,000,000) escrow reportedly provided by Forrest through Chemstream Holdings as a condition of merger and earmarked for repairs, including of the secondary containment area which precipitated the events at issue here when it failed.

32.     The fact a one million dollar ($1,000,000) escrow for repairs was even a part of the Freedom Industries merger shows that Defendant Southern had actual knowledge of the site's condition, which not only imputes duty but, together with their direct authority over the day-to-

day operations and environmental protection legal responsibilities of Freedom also qualifies Southern and Farrell as "operators" under applicable Federal and State statutes.

*The AmWater Defendants Failed to Prepare for the Foreseeable Release of Crude MCHM Into the Elk River, Failed to Protect the Public During the Emergency, and Knowingly Distributed Contaminated Water to Customers*

33.    Defendant WV AmWater operates a water treatment plant just downstream from the facility of Freedom Industries. As such, WV AmWater has a responsibility to perform full risk assessment of any potential sources of pollution upstream from its water intake on the Elk River.  Such a risk assessment should have encompassed the known risk presented by the Freedom Industries facilities and storage of toxic chemicals, including Crude MCHM, at that location.

34.    In April 2002, the West Virginia Department of Health and Human Resources (WVDHHR) in a Source Water Assessment Report advised Defendant WV AmWater that its water supply was highly susceptible to contamination. Further, WVDHHR in that same report specifically advised Defendant WV AmWater that the "Pennzoil Manufacturing site" was a potential point source of contamination. Freedom Industries now sits on the former Pennzoil Manufacturing site.

35.    The WVDHHR report recommended that WV AmWater develop an alternate water source in the event that the water supply at the current intake became contaminated and suggested that Defendant WV AmWater create and implement a Source Water Assessment Plan that would provide for an alternate water supply in the event of contamination.

36.    Despite the foreseeable risk of contamination from the nearby Freedom Industries facility, Defendant WV AmWater did not develop an alternate source of water for its 300,000 users in West Virginia or create and implement a Source Water Assessment Plan.

37.     WV AmWater failed to comply with the standards and requirements set forth under the Safe Drinking Water Act, other state and federal statutes and the common law of West Virginia.

38.     Despite having been warned of the foreseeable risk by the WVDHHR in the April 2002 Source Water Assessment Report, Defendant WV AmWater:

(a) failed to implement any means to shut off the water intake in the event of contamination of the Elk River.

(b) failed to establish any means to store and/or divert contaminated river water from entering the treatment plant's filters.

(c) failed to implement a full activated carbon treatment system. Instead, it negligently relied on a three-foot activated carbon cap on its sand filters.

(d) failed to have standby or emergency response filtration systems available to it in the foreseeable event that its primary filtration system became saturated, overcome, or otherwise rendered ineffective by high concentrations of contaminants which it knew to be stored in large quantities upstream of the WV AmWater intake.

(e) failed to have a means to re-process or recharge its primary filtration systems in the foreseeable event that its primary filtration system became saturated, overcome, or otherwise rendered ineffective by high concentrations of contaminants which it knew to be stored in large quantities upstream of the WV AmWater intake.

39.     Defendant WV AmWater, without fully assessing the risk, dosed the raw water coming into the plant with potassium permanganate, a chemical oxidizing agent "incompatible" with Crude MCHM as stated on Eastman's MSDS.

40.     Defendant WV AmWater filled tankers with contaminated water from the treatment plant in Charleston and then distributed that water to users seeking emergency replacement water supplies.

41.     Defendant WV AmWater thus distributed to its customers, including members of WVHTA and its assignors, drinking water that was contaminated with Crude MCHM.  At the time it distributed contaminated drinking water to its customers, Defendant WV AmWater knew or should have known that such water was contaminated with a dangerously toxic chemical which was likely to cause serious adverse health effects to those who were exposed.

42.     On information and belief, WV AmWater shared with both AmWater Works and AmWater Service its intent to distribute contaminated water to its customers before and during its distribution of such water.

43.     Individuals in the vicinity of the spill at the Freedom Property and individuals receiving water contaminated with MCHM in their homes, establishments, and at their places of business complained of a noxious licorice-like odor, nausea, and vomiting.

44.     On or about January 9, 2014, Defendant WV AmWater announced publicly that water which it had distributed and which was intended for potable consumption from its facility in Charleston had become contaminated by the spill from the Freedom Industries, Inc., site.

45.     On the same date, West Virginia Governor Earl Ray Tomblin, recognizing a clear endangerment to human health, declared a State of Emergency for the nine West Virginia counties in which consumers of West Virginia-American Water were located (Kanawha,

Putnam, Cabell, Boone, Clay, Jackson, Logan, Lincoln, and Roane), and residents of the affected area were advised not to drink, bathe, or wash with water that had been distributed by Defendant WV AmWater. The contamination thus forced the closure of schools, businesses, restaurants, bars, hotels, and government buildings, compelled hospitals and nursing homes to curtail operations or to obtain alternative supplies of potable water, and caused the loss of substantial revenue to the West Virginia economy.

46. On or about January 10, 2014, the President of the United States declared a federal emergency for the affected areas of West Virginia in response to the spill event.

47. Although in late January the State of West Virginia eventually advised the public that consumption of water distributed by Defendant WV AmWater could resume, the U.S. Centers for Disease Control and Prevention ("CDC") advised that pregnant women should not consume it.

48. Due to the uncertainty and lack of information regarding the health and environmental consequences of exposures to Crude MCHM and PPH, CDC reported "screening levels" of 1 part per million ("ppm") for Crude MCHM and 1.2 ppm for PPH. Thereafter, Governor Tomblin, in discharge of his Constitutional authority to protect the public and public health in times of emergency established a safe drinking water maximum contaminant level at 10 parts per billion ("ppb") for Crude MCHM.

49. It was not until February 28, 2014 that the Governor of West Virginia lifted the State of Emergency declaration.

50. On or about March 3, 2014, CDC advised that pregnant women could resume drinking water distributed by West Virginia-American Water.

*Eastman's Prior Knowledge of the Dangers of Crude MCHM Exposure, its Duty To Characterize its Product, and its Duty to Warn the Public of Those Dangers*

51.     Defendant Eastman has a duty to properly characterize the toxicity of the chemicals it sells, to warn the public of the dangers associated with any known toxicity and to take appropriate measures to ensure safe handling by its customers given Eastman's knowledge of the dangers posed by the product should it be released into the environment.

52.     Defendant Eastman had a duty to characterize the environmental and health risks of Crude MCHM, did so negligently and with conscious disregard of the chemical's toxicity/corrosivity and caused the damages complained of herein. That fact that Crude MCHM may break down in the environment is well known and foreseeable. The likely breakdown and metabolite chemicals of Crude MCHM are known to be dangerous and toxic, including, but not limited to, carcinogens and neurotoxins, like formaldehyde.

53.     Defendant Eastman failed to properly characterize and therefore failed to warn properly of the risk to public health and the environment of the toxicity of Crude MCHM in that internal reports about the product's toxicity reached conclusions of low toxicity when the data in those internal reports implicated higher toxicity.

54.     Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment when it assumed the Crude MCHM would be confined to the controlled industrial setting of a coal processing plant instead of released into the environment where residential contact would be foreseeable. Given the coal industry's abysmal record of unpermitted discharges of coal slurry into both surface and groundwater, Defendant Eastman reasonably should have foreseen that even when used in a controlled coal processing plant, Crude MCHM may be introduced into the environment.

55.     Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment when it ignored the objective data collected in its study

"Determination of Ready Biodegradability (Biotic Degradation) Using the CO2 Evolution Test (Modified Sturm)," concluding that "it is unlikely the test substance would persist in an aquatic environment as evidenced by the significant carbon dioxide evolution," despite the fact that the "crude material contained significant impurities including water."

56.     Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment by requesting, as the study sponsor, that stability of Crude MCHM not be determined prior to commencing testing and requesting that the uniformity/concentration of Crude MCHM not be confirmed in a test entitled, "An Acute Aquatic Effects Test with the Fathead Minnow."

57.     Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment when the cause of death of twenty rats "was not determined" in an Eastman study entitled "Acute Toxicity of 4-Methylcyclohexane Methanol."

58.     Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment when it again did not determine the cause of death of two rats who died during a test of "Acute Dermal Toxicity in the Rat for Crude MCHM."

59.     Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment when it ignored deaths, erythema, desquamation, moderate to severe transient weakness, prostration, stumbling, red urine, and splenic lesions noted during the test of "Acute Dermal Toxicity in the Rat for Crude MCHM" in which Defendant Eastman concluded that despite these results the substance was only "slightly toxic."

60.     Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment and the toxic genetic risk of pure Crude MCHM, Crude

MCHM or the potential breakdown chemicals, if either were to be released in the environment where humans could be exposed.

61.     Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment posed by pure MCHM or Crude MCHM by failing to consider the breakdown chemicals that would result from reactivity between pure MCHM and Crude MCHM and chemicals used in the treatment of municipal water supplies, as well those as found in the environment.

62.     The known risks of exposure to Crude MCHM breakdown chemicals were not disclosed by Eastman. Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment of Crude MCHM or its known toxic constituent and/or breakdown chemicals.

63.     The foreseeable risks of Crude MCHM could have been reduced or avoided by reasonable instructions or warnings. Their omission renders the Crude MCHM unsafe and unreasonably dangerous.

64.     Defendant Eastman in its MSDS sheet for Crude MCHM described as unknown the chemical's reactivity. Defendant Eastman had a duty to investigate the chemical's reactivity but failed to undertake the necessary research.

65.     Defendant Eastman owes a duty under applicable statutory and common law to make full disclosure of threats to human health in MSDS sheets for Crude MCHM and to reflect accurately the state of knowledge of the medical and scientific communities about the toxicity of Crude MCHM.

66.     Defendant Eastman placed Crude MCHM into interstate commerce. The foreseeable risks of harm posed by Crude MCHM could have been reduced or avoided by

reasonable instructions or warnings. Their omission renders the product not reasonably safe. Crude MCHM is unreasonably dangerous.

67.    Defendant Eastman issued MSDS sheets and other warning data that were insufficient, inadequate, and not protective of human health and the environment.

68.    Because Defendant Eastman's MSDS sheets did not accurately characterize the toxicity of Crude MCHM and thus the foreseeable risks posed by its release, it was reasonably foreseeable for businesses in the affected area to refrain from operating and/or to incur additional costs associated with operating with bottled water regardless of assurances of water safety by government officials.

69.    Defendant Eastman improperly disclosed in its MSDS sheets numerous items for which Defendant Eastman alleged that data was not available when Defendant Eastman should have relied on myriad sources of available data including its own testing of Crude MCHM and scientific literature disclosing known health effects of its component, constituent, breakdown, and/or metabolite chemicals.

70.    Defendant Eastman improperly disclosed it its MSDS sheets information relating to the corrosive nature of Crude MCHM which significantly contributed to the leak at Freedom Industries.

71.    Defendant Eastman failed to disclose the full extent of its knowledge of the potential adverse health impacts of Crude MCHM.

72.    Defendant Eastman failed to provide proper chemical analysis of Crude MCHM to customers.

73.     Defendant Eastman failed to disclose to customers, regulators or the public, either via statutory notice, MSDS sheet or public announcement the fact that aldehydes were expected to be part of the chemical composition on MCHM.

*Following the Spill, the State Evaluated Crude MCHM*
*And Promptly Recognized its Toxic Characteristics*

74.     At the instance of the Governor of West Virginia, the West Virginia Bureau for Public Health established the West Virginia Testing Assessment Project ("WV TAP") in February 2014 to initiate an in-depth analysis to determine the odor threshold for Crude MCHM, to begin assessing tap water in homes in the affected areas, and to establish a panel of independent experts to evaluate the safety factor for the chemicals spilled by Freedom Industries.

75.     On or about March 17, 2014, WV TAP released a report entitled "Health Effects for Chemicals in 2014 West Virginia Chemical Release: Crude MCHM Compounds, PPH and DiPPH," stating that "the exact chemical composition of the spilled liquid" from Freedom Industries "remains somewhat undefined" and that the "exact composition" makeup of the chemicals "has not been chemically confirmed."

76.     WV TAP explained in its report that Crude MCHM contains a mixture of six organic compounds, MCHM, MMCHM, MMCHC, DMCHDC, CHDM and Methanol, but that it has been reported by Freedom Industries, Inc., that in addition to Crude MCHM, the leaked liquid also contained PPH Glycol Ether (PPH) and DiPPH.

77.     WV TAP's report explained that "[v]ery limited toxicological data has been reported for Crude MCHM or pure MCHM[.]"

78.     WV TAP reported that the United States Environmental Protection Agency has developed a national system providing toxicity information to the public but that it lists

absolutely no toxicology data for Crude MCHM, MCHM, MMCHM, MMCHC, PPH, DiPPH and Polypropylene glycol phenyl ether.

79.     WV TAP noted that the USEPA list of maximum contaminant levels for drinking water does not include any level with regard to the known chemical ingredients of Crude MCHM or PPH.

80.     WV TAP also issued a "Technical Memorandum" on a short study conducted regarding the odor threshold concentration and recognition level of people with regard to Crude MCHM in water.

81.     The study indicated that humans' could detect the odor of Crude MCHM when it was lower than analytical reports could detect.  The study also indicated that because of the odor, people objected to consuming the water.

82.     A report published in April 2014 and titled "Elk River Chemical Spill Health Effects / Findings of Emergency Department Record Review" (attached hereto as Exh. B), the West Virginia Bureau for Public Health ("WVBPH") and the Agency for Toxic Substances Disease Registry ("ATSDR"), contained the agencies' observations following their review of emergency room records from local hospitals.  The agencies reported that at least 369 persons sought and obtained treatment at Charleston-area emergency rooms for symptoms associated with MCHM exposure.  Of these persons, 13 individuals—typically persons who as a consequence of chronic diseases were particularly vulnerable—were admitted to the hospital for treatment.

83.     WVBPH and ATSDR also reported their conclusions concerning Crude MCHM, PPH, and their effects on human health.  The agencies observed as follows:

> Exposure to liquid MCHM can cause skin and eye irritation, vomiting, and diarrhea. MCHM vapors in the air can also irritate the eyes, nose, throat, and lungs. When

laboratory animals are exposed at high doses, MCHM has been shown to cause problems with the liver, kidneys, blood, and the brain.

*     *     *

Health effects of PPH are similar to those caused by MCHM.

(Exhibit B)

84.    The West Virginia Department of Health and Human Resources has provided higher estimates:  that at least 26 people were admitted to area hospitals and 533 were treated and released at those facilities for symptoms related to Crude MCHM exposure.  The Executive Director of the West Virginia Department of Health recently stated publicly that "Those [numbers] are probably gross underestimates of the true public health impacts."

85.    According to recent estimates by WV TAP over 100,000 people experienced skin reactions, eye irritation, nausea or other ailments after exposure to Crude MCHM.

<em>Crude MCHM is a "Hazardous Substance" Under CERCLA</em>

86.    CERCLA Section 102(a), 42 U.S.C. § 9602(a), directs the Administrator of the U.S. Environmental Protection Agency to designate "as hazardous substances . . . such elements, compounds, mixtures, solutions, and substances which, when released into the environment may present substantial danger to the public health or welfare or the environment."  42 U.S.C. § 9602(a).  The Administrator's designations are set forth at 40 C.F.R. § 302.4, in which the substance "methanol" is listed.  As noted above, methanol is a component of the chemical mixture manufactured and marketed by defendant Eastman Chemical Co. as Crude MCHM.

87.    In interpreting the provisions of CERCLA § 102(a) and 40 C.F.R. § 302.4, Federal courts have consistently held that where a waste material contains a designated hazardous substance, like methanol, then the entirety of that waste material is itself a hazardous substance for the purposes of CERCLA.  *See, e.g., State of Arizona and the City of Phoenix* v. *Motorola, Inc.,* 774 F. Supp. 566 (D. AZ, 1991) *United States* v. *Carolawn,* 21 Env't Rep. Cases

-21-

2124, 2126 (D.S.C. 1984). Accordingly, the Crude MCHM released into the environment from the Freedom Industries, Inc. Charleston, WV, site—a substance which contains a CERCLA hazardous substance— site and the soils and waters contaminated with it are undeniably a "Hazardous Substance" within the meaning of CERCLA § 101(14), 42 U.S.C. § 9601(14).

## COUNT I
## RECOVERY OF RESPONSE COSTS UNDER CERCLA § 107(a)
### (Asserted by WVTHA, as Assignee, Against AmWater Defendants, Ferrell, and Southern)

88.     Plaintiff incorporates and realleges the foregoing paragraphs, above, as if fully set forth herein.

89.     On or about January 9, 2014, the Freedom Industries, Inc., site, located on the Elk River in Charleston, WV, was a "facility," within the meaning of 42 U.S.C. § 9601(9).

90.     On or about January 9, 2014, Defendants Ferrell and Southern were owners and/or operators of the Freedom Industries, Inc., site, located on the Elk River in Charleston, WV.

91.     On or about January 9, 2014, Crude MCHM was released and disposed of at the Freedom Industries, Inc., site, located on the Elk River in Charleston, WV, and into the environment.

92.     The WV AmWater intake and distribution plant, located on the Elk River downstream from the Freedom Industries, Inc., location in Charleston, WV, is a "facility" within the meaning of 42 U.S.C. § 9601(9). Such facility is owned and operated by the AmWater Defendants.

93.     Under 42 U.S.C. § 9601, the term "environment" includes any drinking water supply, inclusive of any raw or finished water source that is may be used by a public water system (as defined in 42 U.S.C. § 300f, *et seq.*), and any drinking water supply within the United

States.  42 U.S.C. § 9601(8) and (9).  Accordingly, the Elk River and the public drinking water system serving WV AmWater customers are expressly within the definition of the term "environment" under CERCLA.

94.     On or about January 9, 2014, Crude MCHM was released, disposed of, and distributed from WV AmWater intake and distribution plant and into the environment.

95.     As a consequence of the foregoing disposal of Crude MCHM and such substances' release to the environment, the assignors incurred necessary costs of response, on and following January 9, 2014, in a manner consistent with the National Oil and Hazardous Substance Contingency Plan ("National Contingency Plan" or "NCP"), 40 C.F.R. Part 300.  Such costs of response included costs associated with the provision of alternative water supplies, the cost of evacuation and housing of affected individuals, efforts to minimize human exposure to Crude MCHM, the costs incurred in removing Crude MCHM from pipes and conveyances, and cleaning/flushing of affected conveyances and water storage systems.

96.     Pursuant to 42 U.S.C. § 9607(a), Defendants Ferrell, Southern, AmWater Works, AmWater Service, and WV AmWater are jointly and severally liable to Plaintiff for all costs of response incurred by the assignors consistent with the National Contingency Plan.

## COUNT II
## JUDICIAL ABATEMENT OF A PUBLIC NUISANCE
### *(Asserted by the Plaintiff Association on Behalf of All of Its Members)*

97.     Plaintiff incorporates and realleges the foregoing paragraphs as if fully set forth herein.

98.     Under West Virginia law, a public nuisance is "an act or condition that unlawfully operates to hurt or inconvenience an indefinite number of persons."  *Hark v. Mountain Fork Lumber Co.*, 127 W.Va. 586, 595-96, 34 S.E.2d 348, 354 (1945).  The Restatement (Second) of

-23-

Torts § 821B defines a public nuisance as "an unreasonable interference with a right common to the general public."

99.   Where a condition "is shown by facts and circumstances to constitute a nuisance affecting public health 'no measure of necessity, usefulness or public benefit will protect it from the unflinching condemnation of the law.'" *Board of Com'rs of Ohio County v. Elm Grove Mining Co.*, 122 W.Va. 442, 9 S.E.2d 813, 817 (W.Va. 1940) (quoting 1 Wood on Nuisances, 3d Ed., § 19); *Respublica v. Caldwell*, 1 U.S. 150 (1785).

100.   The aforementioned acts and omissions of the Defendants caused or contributed to conditions within the ambient air and public water supply of significant portions of the West Virginia Counties of Kanawha, Putnam, Cabell, Boone, Clay, Jackson, Logan, Lincoln, and Roane which were harmful to human health and offensive to the senses, such that an ordinary person would reasonably be annoyed or disturbed, and which constituted an unreasonable interference with the free use and enjoyment of such public water supply.  Such conditions commenced on January 9, 2014, and continued for a period of approximately ten days thereafter.

101.   Commencing on January 9, 2014, and continuing for several months thereafter, the spill of toxic Crude MCHM and the injurious and destructive effects of that spill on human health (including both West Virginia residents and visitors to the State), fish, fowl, and other wildlife, the ambient air, the public water supply, the rivers, streams, and waterways of the State of West Virginia, and virtually all other aspects of the State's rich natural and recreational resources were well publicized in both national and international news media, including newspaper and television, and on internet news sites.  The State's tragedy was, in fact, one of the leading national news stories for the month of January 2014; few consumers of news media were unaware of the spill.

102.    As an additional consequence of Defendants' acts and omissions, the public perception and reputation of the State of West Virginia as a desirable destination for recreation, leisure, vacation, and natural beauty, was severely harmed, particularly in areas directly affected by the MCHM spill.  This damaged reputation has had a significant negative impact upon the tourism and hospitality industry, including all members of WVHTA—an impact which continues to this day, as the State's tourism and hospitality industry has not yet fully recovered from the MCHM Spill.

103.    The seriousness of the harm caused by such noxious and offensive conditions outweigh any social utility of the Defendants' conduct.

104.    No members of WVHTA consented, in any manner, to the acts and omissions of Defendants which caused such conditions.

105.    Although the harm caused by the distribution of contaminated water affected over three hundred thousand customers, the harm suffered by the members of WVHTA was different from the type of harm suffered by the general public in that the members of WVHTA not only received noxious contaminated drinking water, they also were forced to close completely their businesses, cancelling reservations for accommodations and dining and turning away customers, for a lengthy period of time.  This resulted in loss of revenue not only from the closure but also from the continuing taint associated with the contamination.

106.    The aforementioned conduct of each of the Defendants was a substantial factor in causing the harm to WVHTA's members.

107.    Had any of the Association's members sought to assert this claim for public nuisance on their own behalf, each would have standing to assert and maintain such claim.  Moreover, the relief sought herein on behalf of its adversely affected members by WVHTA is

germane to its organizational purpose, and the assertion of this claim for public nuisance in no way requires the participation of the Association's individual members.

## COUNT III
### PRIVATE NUISANCE
*(Asserted by WVHTA, as Assignee, Against All Defendants)*

108.   Plaintiff incorporates and realleges the foregoing paragraphs, above, as if fully set forth herein.

109.   Each of the assignors had a right to operate its business and otherwise to use and enjoy its own property or business.

110.   Through the aforementioned acts, each of the Defendants caused or contributed to the harmful and noxious conditions described above, which conditions constituted an unreasonable interference with each of the assignor's rights to operate, use, and enjoy its property and its business.

111.   The harmful and noxious conditions caused by Defendants continued for an unreasonable period of time, causing prolonged closure of the assignors' business establishments and the resulting loss of revenues.

112.   As a proximate result of Defendants' acts and omissions and of the conditions which the Defendants caused or contributed to, each of the assignors suffered property damage, including the lost use and enjoyment of contaminated property which required cleaning and purification, and loss of revenue, both during the period of closure and during the months that have followed.

## COUNT IV
## NEGLIGENCE
### *(Asserted by WVHTA, as Assignee, Against All Defendants)*

113.    Plaintiff incorporates and realleges the foregoing paragraphs, above, as if fully set forth herein.

114.    Defendants WV AmWater, AmWater Works, and AmWater Service (collectively, "AmWater Defendants") owed a duty of reasonable care to Plaintiff's assignors which duty was breached by a variety of acts and omissions including, but not limited to, failure to address the foreseeable risk posed by the Freedom Industries facility (as warned of by the WVDHHR), failure to adequately warn the assignors, failure to design, maintain, and operate its water treatment plant according to industry standards so as to protect public health and safety, negligently and unreasonably delivering and placing on the assignors' property a toxic and noxious substance, Crude MCHM, and failure to ensure that water tankers were not filled with contaminated water. Those breaches proximately caused the damages complained of herein.

115.    The AmWater Defendants were negligent in at least the following respects:

(a) Failing to address the foreseeable risk warned of by the WVDHHR;

(b) Failing to ascertain the nature and extent of potential threats to the Elk River water supply, such as the Etowah River Terminal storage facility, and to take appropriate steps to prepare for the possibility of a chemical leak;

(c) Failing to monitor and maintain adequate water reserves in the event of a necessary disruption of the water intake and purification process;

(d) Failing to maintain and monitor appropriate carbon filtration reserves;

(e) Negligently and unreasonably delivering and placing on the assignees' property a toxic and noxious substance, Crude MCHM;

(f) Failing to take appropriate steps after learning of the upstream chemical leak from the Etowah River Terminal, such as contacting CHEMTREC or the manufacturer of the chemical, to obtain information necessary for the prompt protection, remediation, and restoration of its water treatment facilities and water supply;

(g) Failing to adequately warn the assignees;

(h) Failing to ensure that water tankers were not filled with contaminated water during the emergency response; and

(i) Failing to take appropriate and prompt steps to flush its water treatment facility and water supply system.

116.    The AmWater Defendants committed a series of additional breaches through their failure to budget for, fund, and implement an alternate water supply to avoid the foreseeable risk posed by the Freedom Industries site, of which WVDHHR had warned.

117.    Defendant Eastman owed a duty of reasonable care to the Plaintiff's assignors which was breached by Eastman's failure to properly warn of foreseeable risks, including in its MSDS sheets.

118.    Defendant Eastman committed two independent acts of negligence when in 2005 and again in 2011, Defendant Eastman failed to properly characterize and warn the Plaintiff's assignors of the adverse health effects of Crude MCHM.

119.    Defendant Eastman also breached its duty to the Plaintiff's assignors by failing to properly warn of foreseeable risks after it became clear that the Plaintiff's assignors were being exposed outside of a controlled industrial environment.

120.    Upon information and belief, Crude MCHM is a corrosive chemical (unlike pure MCHM, an organic, and unlike the gasoline and diesel products originally stored at the Etowah

River Terminal site) because of the high percentage of water (4% to 10%) contained within it and its tendency to separate during storage into an organic layer and a corrosive water layer. Defendant Eastman breached its duty to Plaintiff's assignors and placed them of a substantially and unreasonably increased risk of harm through its failure to warn and advise its customers of the corrosive nature of Crude MCHM.

121.   Defendants Farrell and Southern owed a duty of reasonable care to the Plaintiff's assignors which duty was breached by a variety of acts and omissions including, but not limited to, failure to immediately address the foreseeable risk apparent upon assuming control of WV AmWater. Those breaches proximately caused the damages complained of herein.

122.   Defendants Farrell and Southern knew or should have known of the inherent dangers with the condition of the Freedom Industries' site prior to the spill and should have taken steps to prevent the spill.

123.   Defendants Farrell and Southern had a duty to obey the laws and regulations of the United States and the State of West Virginia of which his breach proximately caused the damages complained of herein.

124.   The Defendants' negligence was the proximate cause of Crude MCHM, a noxious and toxic substance, invading the real property of the assignors and causing substantial harm to such real property, including fixtures and pipes (which required flushing), the loss of use and enjoyment of that real property, and the loss of revenues and profits which the assignors would otherwise derive from such property.

125.   Defendants' negligence was also the proximate cause of substantial harm to personal property (such as appliances), including the temporary loss of use of personal property

and from the contamination of personal property and a loss of revenues and profits which the assignors would otherwise have derived from such property.

126.   As a proximate result of Defendants' negligence, Plaintiff's assignors were instructed not to use their tap water for any purpose other than toilet flushing and firefighting for five-to-eight days. The water continued to be impure, with an unpleasant odor and irritating quality, for weeks or even months thereafter.

**COUNT V**
**NEGLIGENCE *PER SE***
*(Asserted by WVHTA, as Assignee, Against Defendants Eastman, Ferrell, and Southern Only)*

127.   Plaintiff incorporates and realleges the foregoing paragraphs, above, as if fully set forth herein.

128.   In a criminal proceeding captioned *United States v. Dennis P. Farrell and Gary Southern*, Case No. 14-cr-00264 (S.D.W.V.) ("the MCHM Criminal Matter"), Defendants Farrell and Southern plead guilty to charges of violating the Refuse Act, 33 U.S.C. §§ 407 and 411 and to two (2) counts of violating conditions of a Clean Water Act permit under 33 U.S.C. § 1319(c)(1)(A).

129.   In connection with these violations, both Farrell and Southern were deemed to be responsible corporate officers ("RCOs") of Freedom.  Farrell was an RCO of Freedom from no later than October 2001 through at least December 6, 2013, during which period he served at Freedom's president and as a member of its board of directors.  Southern was an RCO of Freedom from March of 2010 until and through January 9, 2014. As an RCO, each had the responsibility and authority to ensure that Freedom complied with all laws, including environmental laws.

130.    The elements of a Refuse Act violation include (a) that the defendant discharged or deposited refuse or caused refuse to be discharged or deposited into a navigable water of the United States; and (b) that the discharge was not authorized by a permit.  The Refuse Act exists, *inter alia*, to prevent the type of harm that was presented by the January 9, 2014, release of Crude MCHM to the Elk River.

131.    The elements of a violation of 33 U.S.C. § 1319(c)(1)(A) include: (a) that a violation of a condition of a Clean Water Act permit occurred; (b) that the permit condition implemented sections 1311 or 1318 of Title 33, United States Code; and (c) that the defendant's negligence proximately caused the violation.  33 U.S.C. § 1319(c)(1)(A) exists, *inter alia*, to prevent the type of harm that was presented by the January 9, 2014, release of Crude MCHM to the Elk River.

132.    In the MCHM Criminal Matter, both Farrell and Southern plead guilty to violations of the Refuse Act and to violations of 33 U.S.C. § 1319(c)(1)(A) and thereby admitted to the elements of the Refuse Act violations and to the elements of section 1319(c)(1)(A). Through their violation of the Refuse Act and the Clean Water Act, Defendants Farrell and Southern created precisely the type of harm that such acts were designed to address and therefore committed negligence *per se.*

133.    Eastman manufactured and released into stream of commerce Crude MCHM knowing that it was a harmful, toxic substance that would be used in coal processing plants which are designed to release process water, which would by design include Crude MCHM, into the environment through the National Pollutant Discharge Elimination System ("NPDES") outlets associated with coal processing plants and coal slurry impoundments.

134.   West Virginia Department of Environmental Protection testing has revealed detectable levels at NPDES outlet as high as 1.4 parts per million and as high as 50 parts per billion downstream in nearby creeks.

135.   In 1998, Eastman began to conduct toxicology studies on MCHM with the intention of developing data which would allow the company to remove the warning about the potential for blood disorders from its MSDS sheets. Eastman went so far as to change the breed of rat used in experiments and to abandon on several occasions Good Laboratory Practices in order to sanitize the available safety information about Crude MCHM.

136.   Eastman ignored the alarming data revealed in its studies so that it could draw and then report to the EPA false and/or misleading conclusions regarding the toxicity of Crude MCHM.

137.   Under the Toxic Substances Control Act, Eastman has a duty to perform tests, note adverse health impacts and truthfully report the test results and negative health impacts to the Administrator of the EPA.

138.   The conduct, acts and omissions of Eastman constitute tortious violations of the Toxic Substances Control Act, 15 U.S.C. § 2603 and 15 USC §2614(3)(B), a law intended to protect Plaintiff's assignors from the harm complained of herein.   Accordingly, Eastman committed negligence *per se*.

139.   Such negligence *per se* was the proximate cause of Crude MCHM, a noxious and toxic substance, invading the real property of the assignors and causing substantial harm to such real property, including fixtures and pipes (which required flushing), the loss of use and enjoyment of that real property, and the loss of revenues and profits which the assignors would otherwise derive from such property.

140.    Such negligence *per se* was also the proximate cause of substantial harm to personal property (such as appliances), including the temporary loss of use of personal property and from the contamination of personal property and a loss of revenues and profits which the assignors would otherwise have derived from such property.

141.    As a proximate result of such negligence *per se*, Plaintiff's assignors were instructed not to use their tap water for any purpose other than toilet flushing and firefighting for five-to-eight days. The water continued to be impure, with an unpleasant odor and irritating quality, for weeks or even months thereafter.

## COUNT VI
## GROSS NEGLIGENCE
### *(Asserted by WVHTA, as Assignee, Against All Defendants)*

142.    Plaintiff incorporates and realleges the foregoing paragraphs, above, as if fully set forth herein.

143.    The conduct of Defendants as set forth herein was reckless and wanton, constituting the tort of gross negligence, which resulted in damages to plaintiffs.

144.    The AmWater Defendants are liable for their gross negligence because of the reckless manner in which they ignored threats to the health of the customers and patrons of Plaintiff's assignors both in the design and maintenance of their operations, their warnings and their attempts at delivering water.

145.    Defendant Eastman is liable for its gross negligence because it knowingly failed to properly characterize the risk and thus provide proper warnings necessary to protect the public. Defendant Eastman was reckless and wanton in its decision to sell its waste as a product.

146.    Defendants Farrell and Southern are liable for gross negligence because both clearly understood of the threat posed by the facility but took no actions to avert the water contamination.

147.    Such gross negligence was the proximate cause of Crude MCHM, a noxious and toxic substance, invading the real property of the assignors and causing substantial harm to such real property, including fixtures and pipes (which required flushing), the loss of use and enjoyment of that real property, and the loss of revenues and profits which the assignors would otherwise derive from such property.

148.    Such gross negligence was also the proximate cause of substantial harm to personal property such as appliances from the temporary loss of use of personal property and from the contamination of personal property (such as appliances), including the temporary loss of use of personal property and from the contamination of personal property and a loss of revenues and profits which the assignors would otherwise have derived from such property.

149.    As a proximate result of such gross negligence, Plaintiff's assignors were instructed not to use their tap water for any purpose other than toilet flushing and firefighting for five-to-eight days. The water continued to be impure, with an unpleasant odor and irritating quality, for weeks or even months thereafter.

### COUNT VII
### BREACH OF CONTRACT
#### *(Asserted by WVHTA, as Assignee, Against AmWater Defendants)*

150.    Plaintiff incorporates and realleges the foregoing paragraphs, above, as if fully set forth herein.

151.    A contract existed between each of the Plaintiff's assignors and the AmWater Defendants whereby, as an express or implied term thereof, the AmWater Defendants agreed to provide safe and adequate drinking water and water for other uses.

152.    Under such contract, Plaintiff's assignors were obligated to pay and did pay the AmWater Defendants for the delivery of such water, at a prescribed rate.

153.    American Water Defendants breached their contract with the Plaintiffs, entitling the Plaintiffs to all contract damages, including, but not limited to, damages associated with the breach and consequential damages.

154.    As a consequence of the AmWater Defendants' breach, Crude MCHM, a noxious and toxic substance, invaded the real property of the assignors and caused substantial harm to such real property, including fixtures and pipes (which required flushing), the loss of use and enjoyment of that real property, and the loss of revenues and profits which the assignors would otherwise derive from such property.

155.    As a consequence of the AmWater Defendants' breach, Crude MCHM, a noxious and toxic substance, brought substantial harm to personal property such as appliances from the temporary loss of use of personal property (such as appliances), including the temporary loss of use of personal property and from the contamination of personal property and a loss of revenues and profits which the assignors would otherwise have derived from such property.

156.    As a consequence of the AmWater Defendants' breach, Plaintiff's assignors were instructed not to use their tap water for any purpose other than toilet flushing and firefighting for five-to-eight days. The water continued to be impure, with an unpleasant odor and irritating quality, for weeks or even months thereafter.

157.    At the time of the AmWater Defendants' breach, Plaintiff's assignors were in compliance with the terms of their contract with the AmWater Defendants and are entitled to enforce the terms of that contract.

## COUNT VIII
## BREACH OF EXPRESS AND IMPLIED WARRANTIES
### *(Asserted by WVHTA, as Assignee, Against AmWater Defendants)*

158.    Plaintiff incorporates and realleges the foregoing paragraphs, above, as if fully set forth herein.

159.    Beginning on or about January 13, 2014, AmWater Defendants began issuing instructions to customers (including Plaintiff's assignors) for the "flushing" of their individual water delivery systems. AmWater Defendants divided customers into geographical zones and instructed them to perform the flushing steps at different times over the course of several days, from approximately January 13, 2014 to January 17, 2014.

160.    AmWater Defendants also told customers that they could use its water for all purposes, including drinking, after the prescribed flushing steps were complete.

161.    But the water that AmWater Defendants delivered in the many days immediately following the flushing continued to be contaminated with MCHM. The water was neither pure nor potable. The water continued to have an unpleasant odor and an irritating quality for many days after the systems were flushed.

162.    AmWater Defendants nonetheless charged customers the regular rate for the use of this impure and non-potable water following the system flushing.

163.    AmWater Defendants' actions in selling and charging its customers for the use of impure and non-potable water in the days immediately following the flushing was in violation of their express warranty that the water was suitable for all purposes, including drinking.

164.    AmWater Defendants' actions in selling and charging its customers for the use of impure and non-potable water in the days immediately following the flushing was in violation of their implied warranties under W. Va. Code § 46-2-314, including, but not limited to, their implied warranties that the water pass without objection in the water utility trade and that the water be suitable for the ordinary purposes for which tap water is commonly used, including drinking.

165.    AmWater Defendants' actions in telling their customers that the water it was delivering to customers' homes in the days following the flushing was suitable for all purposes including drinking were unfair or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-6-104, in the following particular respects: (a) 46A-6-102(7)(E) (by representing that the water it was selling was suitable for the use of drinking when it was not and by representing that it did not have any deleterious characteristics when it continued to be irritating to the eyes and skin); (b) 46A-6-102(7)(G) (by representing that the water it was selling was pure and potable, the standard for utility tap water, and that it was of acceptable quality when it was not); (c) 46A-6-102(7)(L) (by making public statements with respect to the quality, characteristics, purity, and potability of its water that were likely to be confusing and misunderstood); (d) 46A-6-102(7)(M) (by concealing from customers that the water it was selling was still contaminated above the odor- and irritant-thresholds for Crude MCHM and likely to have an unpleasant taste and odor and an irritating quality for many days after the flushing); (e) and 46A-6-102(7)(N) (by making deceptive and misleading public

statements concerning the quality, purity, and potability of the water after flushing and causing those statements to be published and broadcast).

166. Plaintiff, as assignee, is entitled to actual damages and/or statutory damages under West Virginia Code § 46A-6-106 for AmWater Defendants' violations of its express and implied warranties and West Virginia Code §§ 46-2-314 and 46A-6-104.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully requests that this Honorable Court award the following relief:

A. As to Defendants Farrell, Southern, American Water Works Company, American Water Works Service Company, and West Virginia-American Water Company, jointly and severally: **(1)** a monetary award, pursuant to 42 U.S.C. §9607(a) and in an amount to be proven at trial, of all costs incurred by Plaintiff's assignors in responding to the release and distribution of Hazardous Substance to and through the public water supply, as described herein; and **(2)** declaratory relief, pursuant to 42 U.S.C. §9613(g)(2)(B), 28 U.S.C. § 2201, and applicable state law, that will be binding in any subsequent action or proceeding to recover response costs or abatement costs with regard to the release and distribution of Hazardous Substance to and through the public water supply, as described herein, and declaring each Defendant jointly and severally liable to Plaintiff for all necessary costs of response incurred by Plaintiff or its assignors in a manner consistent with the NCP;

B. As to all Defendants, pursuant to the law of public nuisance, injunctive relief binding and compelling each Defendant, jointly and severally, to undertake all actions necessary to address the continuing harms caused by the nuisance conditions caused by the Crude MCHM contamination described above, including (without limitation): (1) actions deemed necessary to

avoid and mitigate future endangerments and harms (such as compelling the use of backup filtration systems and enhanced warnings to water consumers); and (2) the undertaking of or the financing of a comprehensive nationwide advertising campaign, designed to rehabilitate and restore the reputation of the West Virginia hospitality and tourist industry in the geographical area adversely affected by the spill of toxic chemical into the Elk River on and before January 9, 2014 and the subsequent distribution of the contaminated water through the public water supply as an area which offers and provides entertainment, recreation, and dining services in a clean, wholesome, pure, healthful, natural, and enjoyable environment;

C.    As to all Defendants, a joint and several award of money damages, in an amount sufficient to compensate Plaintiff's assignors for Defendants' interference and intrusion upon their use and enjoyment of real and personal property, the damage to real and personal property resulting from Defendants' acts and omissions, the lost profits and revenues resulting from Defendants' acts and omissions, amounts necessary to restore the businesses of Plaintiff's assignors to the level of profitability which each enjoyed prior to January 9, 2014, and such other amounts deemed appropriate by this Court;

D.    As to all Defendants, punitive damages, as an exemplary measure, intended to punish Defendants for their grossly negligent conduct and their disregard for the rights and well-being of the members of WVHTA, including Plaintiff's assignors, and to deter others from showing similar disregard;

E.    As to all Defendants, an award of prejudgment interest, pursuant to applicable federal or state law;

F.    As to all Defendants, an award of reasonable attorney fees and costs incurred in obtaining relief on behalf of Plaintiff;

G.      Such other and further relief as this Court deems necessary and appropriate.


Plaintiff further prays for trial by jury, as to all matters so triable, and respectfully requests that this Court retain continuing jurisdiction of this action to the extent necessary and for as long as necessary to enforce and interpret, and to review the Defendants' compliance with, this Court's orders entered herein.


Respectfully submitted:


BY:     */s/Michael O. Callaghan*
        Michael O. Callaghan
        NEELY & CALLAGHAN
        159 Summers Street
        Charleston, WV 25301-2134
        Telephone:  (304) 343-6500
        Facsimile:  (304) 343-6528
        E-Mail:  mcallaghan@neelycallaghan.com