```
             UNITED STATES DISTRICT COURT
          SOUTHERN DISTRICT OF WEST VIRGINIA
                     AT CHARLESTON
```

WEST VIRGINIA HOSPITALITY AND
TRAVEL ASSOCIATION, INC., a West
Virginia Not-for-Profit
corporation, on behalf of all of
its adversely affected members,
and as assignee of certain of
its adversely affected members,

      Plaintiff,

v.                                  Civil Action No. 2:16-cv-00184

AMERICAN WATER WORKS COMPANY,
INC., a Delaware corporation;
AMERICAN WATER WORKS SERVICE
COMPANY, INC., a New Jersey
corporation; WEST VIRGINIA-
AMERICAN WATER COMPANY, a West
Virginia corporation; EASTMAN
CHEMICAL COMPANY, a Delaware
corporation; GARY SOUTHERN, an
individual; and DENNIS P.
FARRELL, an individual,

      Defendants.

## MEMORANDUM OPINION AND ORDER

Pending is plaintiff West Virginia Hospitality and Travel Association, Inc.'s ("Hospitality") motion for partial summary judgment on one issue relating to the question of defendant Gary Southern's liability, filed August 16, 2016.[1]

---

[1] Hospitality included defendant Dennis P. Farrell in its motion for partial summary judgment. (See Mot. Summ. J.) Hospitality has since settled its claims against Farrell, (ECF #68), as set forth in the order of his dismissal, entered March 14, 2018, mooting the pending motion as to him. Thus, Hospitality's

Also pending is Hospitality's motion for leave to file one day late its reply to the response to its motion for partial summary judgment, filed September 29, 2016. That motion is granted, and Hospitality's reply has been taken under consideration as set forth below.

I. Background

On January 9, 2014, a liquid mixture containing crude methylcyclohexanemethanol ("MCHM") leaked from tanks owned by Freedom Industries, Inc. ("Freedom Industries"), into the Elk River near Charleston, West Virginia. (Pl.'s Ex. 1, at 1; Pl.'s Ex. 3, Stipulation of Facts at 1.) MCHM is "a frothing agent used to clean coal" and is itself a mixture of, among other compounds, 1% methanol. (Pl.'s Ex. 1, at 17, 44; Pl.'s Ex. 4, at West Virginia DEP Waste Characterization Form, Freedom Industries MSDS, and Eastman MSDS; Pl.'s Ex. 6, at 4-5.) The leaked MCHM traveled downstream and penetrated the filtration system of a West Virginia American Water ("American Water") plant. (Pl.'s Ex. 1, at 21-23, 44-45.) As a result, American Water issued a "Do Not Use Order," prohibiting water usage for

---

motion for partial summary judgment on the issue of defendant Farrell's liability is denied as moot.

nearly 300,000 people across nine counties in West Virginia and lasting nine days. (Id. at 1, 23.)

A subsequent investigation by the Office of the West Virginia Attorney General opined that

> [t]here was historical negligence at the [tank facility] that resulted in the deterioration of [storage] tanks . . . , a flaw in the concrete pad surrounding the tanks, a failure of the culvert traveling underneath the tank farm, and a breach of the secondary containment wall that ultimately resulted in the contamination of the Elk River.

(Id. at 47; see also id. 28-43, 45-46.) At the time of the leak, Southern was the president of Freedom Industries. (Id. at 18, 43; Pl.'s Ex. 3, Stipulation of Facts at 2.) Southern first joined Freedom Industries in 2009 and later served on the company's board of directors from March 2010 to December 2013, when he entered his role as president. (Pl.'s Ex. 3, Stipulation of Facts at 2.) He succeeded Dennis P. Farrell who was president of Freedom Industries from about October 2001 through around December 6, 2013. (See Pl.'s Ex. 2, Stipulation of Facts at 2.)

On July 18, 2015, Southern pled guilty to three criminal charges under the Clean Water Act and the Refuse Act, each stemming from the MCHM leak: negligent discharge of a pollutant, 33 U.S.C. §§ 1319(c)(1)(A), 1311; unlawful discharge of refuse matter, 33 U.S.C. §§ 407, 411; and negligent violation

of a permit condition, 33 U.S.C. §§ 1319(c)(1)(A), 1311, 1318. (Pl.'s Ex. 3, Plea Agreement at 1.) As part of the plea agreement, Southern stipulated that as both a board member and president, "[he] was a responsible corporate officer of Freedom . . . having the responsibility and authority, along with others, to ensure that Freedom complied with all laws, including environmental laws." (Id., Stipulation of Facts at 2; see also id., Stipulation of Facts at 3-4.) Further, Southern stipulated that his "negligence[,] . . . as a responsible corporate officer of Freedom, . . . was a proximate and contributing cause, albeit not the only proximate or contributing cause, of the discharge of some quantity of MCHM into the Elk River from the [tank facility] on January 9, 2014." (Id., Stipulation of Facts at 4.)

Southern now submits an affidavit in an effort to provide more detail on his role at Freedom and in the MCHM leak. (See Def.'s Ex. A.) After Freedom was acquired by a separate company, Chemstream Holdings, Inc. ("Chemstream"), Southern began his tenure as president of Freedom on December 9, 2013. (Id. ¶ 2.) Southern swears that:

> 3. During my tenure as president of Freedom up to and including January 9, 2014, I understood that I was to report to Jim Barker, a Vice-President of Chemstream who was my supervisor; I also understood that I did not have authority to approve capital expenditures for

4

> Freedom's [tank facility] or any other Freedom facility.
>
> 4. During my tenure as president of Freedom up to and including January 9, 2014, I was not involved in the day-to-day management of operations at the [tank facility].
>
> 5. During my tenure as president of Freedom up to and including January 9, 2014, I did not direct operational employees on the management of hazardous materials produced or stored at the [tank facility], and I did not direct operational employees on the management, storage or disposal of hazardous waste generated at the [tank facility].
>
> 6. During my tenure as president of Freedom up to and including January 9, 2014, I did not draft or sign any reports, applications or certifications required for compliance with environmental regulations.
>
> 7. During my tenure as president of Freedom up to and including January 9, 2014, I did not have any contact or communications with state or federal agencies regarding compliance with environmental regulations or operation of the [tank facility].
>
> 8. After I became president of Freedom in December 2013, I had internal discussions with David McCombie and others at Chemstream about Dennis Farrell's future role in the company. We had discussions about moving Farrell to the role of supervising Freedom's sales force immediately but I was told that Chemstream wanted to move at a slower pace so Farrell still had substantial operational responsibilities on January 9, 2014. The plan was for David McCombie to become Freedom's future president and eventually replace me. To improve his knowledge of the business, McCombie wanted to spend time shadowing me on the administrative side and Farrell and Mike Burdette, Director of Operations for the [tank facility], on the operational side before Farrell was moved into the sales position full time.

(<u>Id.</u> ¶¶ 3-8.) Southern further swears that "[he] worked in the Charleston, West Virginia area for approximately eight days" of

the month or so he was president of Freedom; that "[he] was not present at the [tank facility] on each of those days;" and that he was travelling for work when the leak was detected.  (Id. ¶ 9.)

Hospitality is a West Virginia not-for-profit with its principal place of business in Charleston, West Virginia.  (Pl.'s Am. Ex. 12, at ¶ 2.)  Hospitality is comprised of various "tourism and hospitality establishments."  (Compl. ¶ 4.)  Its purpose is to further the interests of its member-establishments and of "the tourism and hospitality industries in West Virginia."  (Id.)  Constantine Stanley, the chief executive officer and president of one of Hospitality's member-establishments, Adelphia, Inc., swears that his company incurred about $3,576 in water-related expenses as a result of the MCHM leak.  (See Pl.'s Ex. 13 ¶¶ 1, 3-5.)

On January 8, 2016, Hospitality initiated this action in this court on behalf of its adversely affected members and as assignee of the claims of some of its adversely affected members.  The gist of Hospitality's claims is that its members suffered and continue to suffer economic and non-economic harms as a result of the January 9, 2014, MCHM leak.  (See Compl. WHEREFORE Clause.)

Pertinent here, Hospitality claims that Southern is "jointly and severally liable to [Hospitality] for all costs of response incurred" under section 107(a) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a). (Id. ¶ 96.) CERCLA "was designed to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination." Burlington N. & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 602 (2009) (internal quotation marks omitted). Hospitality insists that Southern is "responsible for the contamination" - and thus the corresponding costs incurred by Hospitality - caused by the MCHM leak. (See Compl. ¶ 96.)

Hospitality has moved for summary judgment on this one issue of Southern's liability. The motion is now ripe for review.

II. Motion for Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

"As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citing 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2725 (2nd ed. 1983)).

Regarding genuineness, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The moving party has the initial burden of "'showing' - that is, pointing out to the district court - that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986); see also Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013). If the movant carries its burden, the non-movant must demonstrate that "there is sufficient evidence favoring [it] for a jury to return a verdict" in its favor. Anderson, 477 U.S. at 249 (citation omitted); see also Dash, 731 F.3d at 311. "Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere

existence of a scintilla of evidence." Dash, 731 F.3d at 311 (citing Anderson, 477 U.S. at 252, and Stone v. Liberty Mut. Ins. Co., 105 F.3d 188, 191 (4th Cir. 1997)).

III. Discussion

The United States Court of Appeals for the Fourth Circuit has concisely described a private cause of action under CERCLA as follows:

> CERCLA allows "private parties to recover the costs of cleaning up hazardous wastes from certain defined types of person." Axel Johnson, Inc. v. Carroll Carolina Oil Co., 191 F.3d 409, 413 (4th Cir. 1999). A private-party plaintiff establishes a prima facie case for cost recovery under CERCLA by establishing that (1) the defendant is a potentially responsible person . . . ; (2) the site constitutes a "facility"; (3) a "release" or a threatened release of hazardous substances exists at the "facility"; (4) the plaintiff has incurred costs responding to the release or threatened release of hazardous substances ("response costs"); and (5) the response costs conform to the National Contingency Plan. 42 U.S.C. §§ 9601(9), (22), 9607(a); see ABB Indus. Sys., Inc. v. Prime Tech., Inc., 120 F.3d 351, 356 (2d Cir. 1997).
>
> Section 9607(a) establishes strict liability. See United States v. Monsanto Co., 858 F.2d 160, 167 (4th Cir. 1988). This liability under CERCLA is subject only to a few narrow defenses and exemptions. See 42 U.S.C. § 9607(b) (defenses); id. § 9607(o)-(r) (exemptions). Liability is, by default, joint and several. See Monsanto, 858 F.2d at 171-72.

PCS Nitrogen, Inc. v. Ashley II of Charleston LLC, 714 F.3d 161, 167-68 (4th Cir. 2013). The parties dispute (1) whether Southern is a potentially responsible person under CERCLA; (2)

9

whether Hospitality has provided sufficient proof of incurred response costs; and (3) whether Hospitality has established causation as to Southern. For reasons stated below, the court finds that Southern has produced evidence such that a reasonable jury could find that he was not a potentially responsible person under CERCLA. And because Southern prevails on the first point of dispute, the court does not reach the latter two.

Under CERCLA, potentially responsible persons

> include (1) the current[2] "owner" or "operator" of a "facility"[3]; (2) any "person" who "owned" or "operated" the "facility" at the time of disposal[4] of a hazardous substance; (3) any "person" who "arranged for disposal or treatment" of hazardous substances at the "facility"; and (4) any "person" who accepts hazardous substances "for transport to disposal or treatment facilities, incineration vessels or sites."

---

[2] In the statute, the term "current" is not used in conjunction with "owner" or "operator." See 42 U.S.C. § 9607(a)(1).

[3] "The term 'facility' means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located . . . ." 42 U.S.C. § 9601(9).

[4] "The term 'disposal' means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters." 42 U.S.C. § 6903(3) (definition adopted in full by 42 U.S.C. § 9601(29)).

PCS Nitrogen, 714 F.3d at 172 (citing 42 U.S.C. § 9607(a)(1)-(4) and Nurad, Inc. v. William E. Hooper & Sons Co., 966 F.2d 837, 841 (4th Cir. 1992)). Hospitality argues that Southern was indisputably an "operator" of Freedom's tank facility. (Mem. Supp. 18-20; Reply Supp. 5-8).

CERCLA circularly defines "operator" as "any person . . . operating [a] facility." 42 U.S.C. § 9601(20)(A)(ii). In 1992, the Fourth Circuit explained that an operator "need not have exercised actual control in order to qualify as [an] operator[] . . . , so long as the authority to control the facility was present." Nurad, 966 F.2d at 842. Most other circuits endorsed a different view, finding that an operator is "someone actively involved in running the facility, typically on a day-to-day, managerial basis." See United States v. Friedland, 173 F. Supp. 2d 1077, 1094 n.4 (D. Colo. 2001) (noting the circuit split with only the Fourth Circuit, and perhaps the Ninth, following an authority-to-control standard). Thus, the circuit split, along with the tautological definition of operator, spurred the Supreme Court in 1998 to describe an operator as follows according to the word's "ordinary or natural meaning":

> [A]n operator is simply someone who directs the workings of, manages, or conducts the affairs of a facility. To sharpen the definition for purposes of CERCLA's concern with environmental contamination, an operator must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations.

United States v. Bestfoods, 524 U.S. 51, 66-67 (1998); see also id. at 66 (describing as "useless[]" the statutory definition of operator).

The crux of the disagreement between Hospitality and Southern stems from whether Bestfoods overruled the explanation in Nurad, which the Fourth Circuit has not resolved. On the one hand, Hospitality points out that the authority-to-control standard endorsed in Nurad readily encompasses Southern by his own admission in the stipulation of facts within his prior guilty plea: "Southern . . . ha[d] the responsibility and authority . . . to ensure that Freedom complied with all laws, including environmental laws." (Mem. Supp. 19-20; Reply Supp. 5-6; Pl.'s Ex. 3, Stipulation of Facts at 2) On the other hand, Southern insists that the issue is much closer based on the details of his affidavit if the definition of operator in Bestfoods overrules Nurad. (See Reply Opp'n 9-13.)

Facially, the Supreme Court's "sharpen[ing]" in Bestfoods appears at odds with the Fourth Circuit's opinion in

Nurad. While the active voice in Bestfoods suggests that an operator must actively "manage, direct, or conduct operations specifically related to pollution," 524 U.S. at 66, Nurad would require only that the authority to do so is present, 966 F.2d at 842.[5]

Closer inspection of the Supreme Court's opinion in Bestfoods tends to confirm that the Court's definition serves to supplant that of Nurad. In Bestfoods, the Supreme Court did not expressly address the authority to control test despite acknowledging that the circuit split was the impetus for review. See 524 U.S. at 60, 60 n.8. Instead, the Court criticized the narrower actual control test as it was sometimes used, finding it prone to improperly encompass those who operate an entity as a whole rather than limit liability to those who actually operate the distinct facility from which there is a release. See id. 67-68. Consequently, if the Court found the actual

---

[5] For their part, the district courts in this circuit post-Bestfoods have reached varying conclusions. Compare S.C. Elec. & Gas Co. v. UGI Utils., Inc., No. 2:06-cv-02627-CWH, 2012 WL 1432543, at *55-58 (D.S.C. Apr. 11, 2012) (endorsing an actual control approach based on the language of Bestfoods), with Veolia Es Special Servs., Inc. v. Techsol Chem. Co., No. 3:07-0153, 2008 WL 706689, at *2 (S.D. W. Va. Mar. 14, 2008) (citing with approval Nurad's authority test), with Ashley II of Charleston, LLC v. PCS Nitrogen, Inc., 791 F. Supp. 2d 431, 478 (D.S.C. 2011) (concluding that current operators, unlike former operators, "need not direct operations related to pollution to be held liable" under CERCLA).

control test too broad, then the Court must have rejected by implication the even broader authority to control test.

It bears noting that the Court in <u>Bestfoods</u> defined its review as "resolv[ing] a conflict among the Circuits over the extent to which parent corporations may be held liable under CERCLA for operating facilities ostensibly under the control of their subsidiaries." <u>Id.</u> 60. In this case, Southern is, of course, an individual and not a corporation. However, the ultimate scope of the Court's analysis extends beyond parent-subsidiary relationships to operators in whatever form they may take. First, the Court's definition of an operator is not limited to any particular subset of operators and speaks generally in terms of "<u>someone</u> who directs the workings of, manages, or conducts the affairs of a facility." <u>See id.</u> 66-67 (emphasis added); <u>cf.</u> 42 U.S.C. § 9601(20)(A)(ii), (21) (defining "operator" as "any person owning or operating such facility" and "person" as "an individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, United States Government, State, municipality, commission, political subdivision of a State, or any interstate body").

Second, the Court's ultimate analysis is in keeping with its generally-applicable definition of operator. The Court

distinguished indirect liability, predicated on piercing the corporate veil, as inapplicable to operator analysis under CERCLA. See Bestfoods, 524 U.S. at 67-70. Rather, the source of operator analysis in the parent-subsidiary context is direct liability, which is "a question about the parent's interaction with the subsidiary's facility." Id. at 67-68. Thus, whether a parent entity is an operator, according to the Court, rests on "whether it operates the facility, and that operation is evidenced by participation in the activities of the facility, not the subsidiary." Id. at 68. In other words, the question in the parent-subsidiary context remains whether the parent "directs the workings of, manages, or conducts the affairs of a facility" – the Court's definition that applies to operators of all types.

In light of the foregoing, the court finds persuasive the District of New Mexico's reading of Bestfoods in New Mexico ex rel. New Mexico Env't Dep't v. EPA, No. 16-CV-465 MCA/LF, 2018 WL 840007 (D.N.M. Feb. 12, 2018). In New Mexico Env't Dep't, the court stated the following:

> Bestfoods criticized the "actual control" test but did not address the "authority to control" test. Instead, the Court relied on CERCLA's statutory language to determine the meaning of the word "operate," ultimately instructing courts to evaluate each party's involvement with or at a facility to determine whether that party operated the facility. . . .

> After <u>Bestfoods</u>, our Tenth Circuit decided the issue of whether a minority shareholder was liable as an operator under CERCLA, and, consistent with <u>Bestfoods</u>, did not apply either the "actual control" or "authority to control" test. <u>Raytheon Constructors, Inc. v. Asarco Inc.</u>, 368 F.3d 1214, 1217 (10th Cir. 2003). The Court focused on the "necessary connection between the potential 'operator' and the facility itself," stating that "operation is evidenced by participation in the activities of the facility." <u>Id.</u> (internal quotation marks and citation omitted).
>
> Although the parties in this case spend some time briefing cases relying on both the actual control test and the authority to control test, in light of <u>Bestfoods</u> and <u>Raytheon Constructors</u> this Court is not persuaded that either test is appropriate. Instead, the Court must focus on the language of CERCLA itself and the principles set forth in <u>Bestfoods</u>.

2018 WL 840007, at *6-7 (footnote and citations omitted).

The record here reveals that Southern served on Freedom's board of directors from March 2010 to December 2013, at which point he became Freedom's president. (Pl.'s Ex. 3, Stipulation of Facts at 2.) Then, during the month while Southern was the president of Freedom, MCHM leaked from Freedom's tank facility into the water supply of nine counties in West Virginia, causing Hospitality's member-establishments to incur costs in response. (<u>Id.</u> at 1; Pl.'s Ex. 1, at 1, 23; Pl.'s Ex. 13 ¶¶ 3-4.) In a subsequent criminal proceeding, Southern stipulated that "[he] . . . ha[d] the responsibility and authority . . . to ensure that Freedom complied with all

16

laws, including environmental laws." (Pl.'s Ex. 3, Stipulation of Facts at 2.)

Through his affidavit attached to his opposition to Hospitality's motion for summary judgment, Southern now disputes any implication created by his guilty plea that he was an operator of Freedom's tank facility.  Generally, Southern swears, despite being president of Freedom when the leak occurred, that his superiors in Freedom's parent corporation, Chemstream, vested in other individuals the actual authority to manage the tank facility and that he never actually managed the tank facility.  (See Def.'s Ex. A ¶¶ 3-9.)

Southern's affidavit plainly disputes whether he operated Freedom's tank facility.  Hospitality contends, however, that Southern's affidavit fails to create a genuine issue of material fact because it "contradict[s] his prior sworn statement."  (Reply Supp. 6-7 (citing Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 105-06 (2d Cir. 2011)).)  Specifically, Hospitality notes that Southern previously stipulated to his "authority . . . to ensure that Freedom complied with all laws, including environmental laws," yet he now swears that he lacked the "authority to approve capital expenditures for Freedom's [tank facility]."  (See id.; Pl.'s Ex. 3, Stipulation of Facts at 2; Def.'s Ex. A ¶ 3.)

As earlier developed, the proper inquiry of the operator issue is whether Southern "manage[d], direct[ed], or conduct[ed] operations specifically related to pollution" at Freedom's tank facility. Bestfoods, 524 U.S. at 66-67. Hospitality's argument is thus misplaced inasmuch as it is grounded in the authority-to-control standard set forth by Nurad, prior to Bestfoods. (See Reply Supp. 5-6.) To the extent that Southern's affidavit does conflict with his prior stipulation, the stipulation is "simply incomplete" regarding actual management of pollution-related activities at the tank facility such that the court "should not disregard the later testimony." Rojas, 660 F.3d at 106 (quoting Jeffreys v. City of New York, 426 F.3d 549, 555 n.2 (2d Cir. 2005)).

Federal Rule of Civil Procedure 56 permits a party opposing summary judgment to submit an affidavit supporting its factual position. Fed. R. Civ. P. 56(c)(1), (4). Southern has done so here, and the court finds that Southern's sworn statements create genuine issues of material facts as to whether he "manage[d], direct[ed], or conduct[ed] operations specifically related to pollution" at Freedom's tank facility. Accordingly, Hospitality's motion for partial summary judgment on this issue of Southern's liability is denied without prejudice.

## IV. Conclusion

For the foregoing reasons, the court ORDERS that

1. Hospitality's motion for leave to file one day late its reply to the response to its motion for partial summary judgment be, and hereby is, granted; and

2. Hospitality's motion for partial summary judgment on the issue of Southern's liability be, and hereby is, denied without prejudice.

The Clerk is directed to forward copies of this memorandum opinion and order to all counsel of record and to any unrepresented parties.

ENTER: March 15, 2018

John T. Copenhaver, Jr.
United States District Judge